IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2007

**STATE OF TENNESSEE v. RIACO LEVERSTON**

**Appeal from the Criminal Court for Shelby County**
**No. 05-02203      Arthur T. Bennett, Judge**

---

**No. W2006-02304-CCA-R3-CD  - Filed December 3, 2007**

---

The defendant, Riaco Leverston, was convicted of voluntary manslaughter, a Class C felony, and was sentenced as a Range II, multiple offender, to ten years in prison.  He appeals this judgment, contending that (1) the evidence is not sufficient to support his conviction, (2) the trial court erred in denying his motion to suppress his statement to police, (3) the trial court erred in admitting a photograph of the dead victim, and (4) his sentence is excessive.  We conclude that no error exists, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Kevin E. Childress, Memphis, Tennessee, for the appellant, Riaco Leverston.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The petitioner was indicted on three counts related to the death of Adrian Pegues:  first degree premeditated murder, first degree felony murder, and especially aggravated robbery.  Rondall Washington was indicted for the facilitation of these offenses.

At the trial, the victim's brother, Deion Pegues, testified that the victim went by the nickname "Turk."  He said Kimberly Beal had been his brother's girlfriend for three or four months before his death and that the victim drove Ms. Beal's Pontiac Sunfire.  He said he knew the victim was involved with drugs but did not know if the victim sold drugs.  He last saw the victim alive the weekend before his death.  He found out about the victim's death from a family friend and coworker.

Rondall Washington testified that he was charged with facilitation related to the defendant's case and that he was in jail. He said that he knew the defendant through his friend Tureasa Jones and that the defendant sold cocaine to Jones. He said he also used cocaine and would "get high" with Jones. He said he knew the victim from high school and also knew him through his involvement with drugs. He said that he fixed cars for a living around the time of the victim's death and also helped friends sell drugs at the Shelby Inn motel. He said he was a "middle man" between two drug dealers known as Bookie and Wookie and their customers. Bookie and Wookie would pay him for his services with drugs. He said the victim came to Shelby Inn many times to buy drugs.

Washington acknowledged that he was convicted of other crimes, including misdemeanor theft in 1998 and 2003. He received probation for the 1998 conviction and served three days in jail for the 2003 conviction. He also had a felony drug conviction, for which he served twenty months in jail. He was convicted of burglary and arson in Arkansas in 2004. He said he was not on probation at the time of the victim's death.

Washington described the events of December 6, 2002, leading to the victim's death. He said that he was at the Shelby Inn and that the victim arrived in the afternoon wanting to buy drugs. He said he told the victim to wait because Bookie and Wookie were not there. He said that while he was waiting outside the motel with the victim, he saw the defendant come out of a door. He said he had never seen the defendant at the Shelby Inn before. The defendant asked them if they knew anyone who could sell him drugs. Washington told the defendant he was waiting for Bookie and Wookie to return, and the victim told the defendant that he knew a man who had some drugs. The defendant said he wanted the victim to take him to that man. The victim, the defendant, and Washington drove to the Whitehaven View Apartments, where they met a man named Kid, who Washington said was also known as "Little Jay." According to Washington, Kid demanded money from the victim that was owed to Kid, the victim promised to pay later in the evening, and Kid responded by saying "man, you going to make me kill you." Washington said Kid then asked the defendant to accompany him to a back room, where the two of them stayed for five or six minutes while the victim and Washington waited. After the defendant returned, he, the victim, and Washington drove back to the Shelby Inn. Washington said the defendant showed them about twenty to twenty-five rocks of crack cocaine that he had received and gave one rock to the victim and Washington to share. The victim and Washington got high, and about twenty minutes later, the victim left in a white car, which Washington said was owned by the victim's girlfriend.

Washington testified that the victim returned to the Shelby Inn at about 3:00 or 4:00 a.m. and asked for more drugs. Washington refused to sell to the victim the two rocks of crack cocaine that he had because he wanted to keep them for his personal use. The victim and Washington then knocked on the defendant's door to see if he had any drugs to sell. Washington said the defendant opened the door with a gun in hand and "looking real crazy" and high. He said the defendant refused to sell drugs to the victim but told the victim he would give him some if the victim drove him to "Pumpkin's" house. Washington explained that "Pumpkin" was Tureasa Jones's nickname. Washington testified that he knew the defendant and Jones were "messing around together" but that he later learned that the defendant was not allowed to go to Jones's house.

Washington testified that the defendant gave the victim some cocaine and that he and the victim were waiting for the defendant in order that they could leave for Jones's house. He said the victim complained to him about the quality of the cocaine the defendant gave him and said he wanted to stop somewhere on the way to Jones's house to get more drugs. He said he, the victim, and the defendant left in the victim's girlfriend's car, with the victim driving, Washington in the passenger's seat, and the defendant in the back directly behind the victim. He said they first stopped at a store to buy cigarettes and then at a house where the victim wanted to buy drugs. He said that while he and the defendant were waiting for the victim in the car, he heard the defendant say, "I wonder how much money he got," referring to the victim. He said he and the defendant did not otherwise speak to each other. He said that after the victim returned to the car, they drove toward Jones's apartment and that Washington began smoking "dope" in the car.

Washington testified that just as the victim was preparing to turn into the entrance of Jones's apartment complex, the defendant told the victim to turn right onto the next street to go through the back of the complex. Washington said they had turned on the street and had passed five or six houses when he heard a gunshot. He said that the victim slammed on the brakes, that the victim asked the defendant, "[w]hat the f— you doing?", and that the victim and defendant both got out of the car. He said that he also got out of the car and that the victim and defendant were "tussling." He said the defendant grabbed the victim and pointed the gun at Washington, ordering Washington back into the car. He said he then heard two more gunshots and that the defendant pushed the victim into the back seat of the car. Washington said he was scared and got into the car. He said he smoked more "dope" while the defendant drove the car behind some warehouses, where he stopped and dragged the victim out of the car. He said he followed the defendant's orders by getting out of the car, closing the back door after the victim was pulled out, and getting into the car.

Washington testified that the defendant left the victim's body on the ground behind the warehouses, drove the car on the expressway, and eventually stopped the car in front of a house. He said he was scared and was smoking cigarettes and "dope." He said that when the defendant parked the car, the defendant ordered him to get out and to sit behind the car while the defendant wiped the car. He said they then walked to the nearby Elvis Presley Inn and got a room for two hours. He said that the defendant put his shirt and a towel he used to dry his hands in a garbage bag and that the defendant gave him more "dope" to smoke. He said the defendant told him the defendant would kill him and his family if he told anyone about what happened. He said that as they were leaving the Inn, the defendant threw away the garbage bag that contained the shirt and towel.

Washington testified that he was still following the defendant's orders when he and the defendant rode the bus to a stop near the Shelby Inn. He said that while they were walking to the Shelby Inn, a man driving a red truck stopped, picked them up, and drove them to the Inn. He said they went into a room and that when the man and the defendant went to the bathroom to talk, he left the room and hid in an abandoned room of the motel. He said he hid for about one hour to one and one-half hours, after which he went to his grandmother's house.

Washington testified that after the victim was shot and placed in the back seat of the car, he could hear the victim making noises. He said he believed the victim was still making noises when the defendant left him behind the warehouses. He said the defendant pulled the victim out of the car by the victim's feet. He said the victim did not have a gun or knife and that the victim never threatened him or the defendant. He said that, aside from the defendant's comment about how much money the victim had, he did not hear the defendant say anything that would raise suspicions. He said the first gunshot the defendant fired from inside the car "just came out of the blue." He said he did not contact the police because he was afraid. He said that while he was hiding at his grandmother's house, several cars drove by and pulled into his grandmother's driveway. He said that he eventually left Memphis and went to a rehabilitation center in Arkansas. He was arrested for burglary and arson in Arkansas in 2004 and then arrested in connection with the present case. Washington said he was certain the defendant was the man who shot and killed the victim.

On cross-examination, Washington acknowledged that in addition to his previously mentioned convictions, he was convicted in 1994 of unlawful possession of a weapon. He said that this was a misdemeanor charge for which he served sixty days. He also acknowledged that he was indicted for facilitation of first degree murder of the victim, which reflected that the state believed he had some involvement in the victim's death. However, he denied that he was involved other than how he described in his direct testimony, and he denied that the victim's death resulted from a robbery plan that went awry. He denied having any knowledge of the defendant's winning money at a casino. He testified that he did not know Kid's name, although he said he worked on Kid's car many times. He said he did not know what happened between the defendant and Kid while they were at Kid's house.

Washington testified that he was smoking crack all day leading up to the victim's death, although he could remember the events of the day. He said that the defendant fired the first shot while riding in the back seat of the victim's car and that the defendant reached over to the victim and shot the victim either in the side or chest. He said the victim was still able to park the car and jump out of it. He said the victim had last smoked crack about twenty or thirty minutes before this. He said he had no idea a murder was going to happen that night. He acknowledged that in a prior statement to police, he said the victim was dragged out of the car on his belly and left on the ground face-down. However, a photograph showed that the victim was found face-up. Washington said that it was dark behind the warehouses and that he could not see the position of the victim's body. He said that it was lighter on the road where the victim was shot because of the street lights.

Washington testified that he did not go to the police after the shooting because he was afraid. He said the defendant threatened to kill him and his family. He said that he left Memphis because he was scared and that people he did not know were coming to his grandmother's house, parking in her driveway, and knocking on her door. He said his grandmother was also scared and wanted him to leave. He said he also left because he had a drug problem and needed to get help. He testified that about a month after the victim's death, Bookie and Wookie found him and beat him because he did not tell them that the defendant had killed the victim. He said Bookie and Wookie were good friends of the victim. He said about two or three weeks after this incident, he told Bookie and Wookie what

happened. He said he also told Tureasa Jones what happened because he was hoping Jones could tell him the defendant's full name in order to report the defendant to the police. Washington said Jones did not know the defendant's name and that he only knew the defendant as "Big Red."

Memphis Police Officer Gary Claxton testified that on the morning of December 6, 2002, he was dispatched to 1576 Three Place in the "warehouse district." He said he saw a black male lying on his back with a gunshot wound in his upper torso. Memphis Police Officer Carl Martin testified that he was dispatched around 9:00 a.m. on December 7, 2002, to an abandoned vehicle at Ralston and Warren Streets. He estimated that this area was five minutes or less from Three Place. He said he found a white 2001 Pontiac Sunfire parked near the curb of the street. He determined that the car was registered to Kimberly Beal. He said he saw a shell casing in the front seat of the car, blood on the back seat, blood on the passenger's side of the front seat, and blood near the door. He recalled also seeing a bullet hole in the door.

R.K. Fuller testified that he worked in the Crime Scene Unit of the Memphis Police Department and that he was called to the scene of a possible homicide on December 6, 2002, near some warehouses. He said he found an African-American male, approximately twenty-five years old, lying in a grassy area. He said the victim appeared to have been shot numerous times. He said he noticed blood on his body and two bullet holes, one in his upper chest and another under his right armpit. When officers went to move the victim's body, they noticed two other gunshot wounds, one near his left shoulder and another along his right hip. He said he also noticed a cut on the victim's right hand. The victim was lying on his back, with his torso partially twisted, and his arms over his head. He said that he found what appeared to be tire tracks near the victim. He said officers also found a metal brace, bloody socks, and a jacket and pants on the ground in the vicinity of the victim. He said officers found a $5.00 bill and a lighter on the victim, in addition to a silver ring, a watch, and a wallet.

Officer Fuller testified that he was called to a different scene on December 7, 2002, to investigate a suspicious vehicle. He said the vehicle was a small, white car that had a large amount of blood inside it. He said the blood was mostly in the back seat and that blood had run out from under the back driver's side door to the outside as well. He said some clothes, possibly men's underwear, was found near the car with blood on it. He said no fingerprints could be identified from the car but that the blood was determined to be the victim's. On cross-examination, Officer Fuller testified that he had no knowledge that connected the two scenes when he investigated them and that he investigated them as separate crime scenes.

Memphis Police Lieutenant Paul Wright, Jr., testified that in 2004 he was a sergeant in the police department, assigned to the Project Safe Neighborhoods Unit. He said that the unit investigated violent crime involving weapons and that the unit took over the investigation of the victim's homicide after it became a "cold case." He said that the defendant had been declared a "person of interest" in the case and was wanted for questioning and probation violation but that officers were not able to locate the defendant for two and one-half years. The defendant was finally located on March 15, 2005, after the Metro Gang Unit received information that he was at an address

in Memphis. Lieutenant Wright said the defendant was taken into custody for questioning and was given food, drink, and breaks as needed.

Lieutenant Wright said he and Detective J.P. Smith interviewed the defendant. He said the defendant was advised of his rights and signed an advice of rights form, waiving his rights and agreeing to speak to the officers. He said the defendant initially spoke for about one and one-half hours about matters not related to the victim's death. The defendant was then given a break and Wright began questioning him about the victim's death. Wright typed the defendant's final statement, and the defendant initialed each page of the statement and signed that he read the statement and that it was true and correct. In the statement, the defendant said he was responsible for the victim's death. He said that he, the victim, and "Tank," whom Wright identified as Rondall Washington, were together at the Shelby Inn Motel drinking and gambling. He said that he asked the victim to take him to see Tureasa Jones and that on the way to Jones's house, the victim stopped to call his girlfriend, whose car the victim was driving. He said the victim stopped at another house on the way, where he got into an altercation with a man. He said the victim was upset and started arguing with him and Washington in the car. He said the victim drove past Jones' apartments and threatened to rob him and Washington. He said the victim told Washington to get out of the car because the victim wanted to talk to the defendant. He said that he was in the backseat and that the victim pulled out a gun. He said he reacted in self-defense by pulling out his own gun and shooting the victim. He said that when he first pulled the trigger, it jammed and then went off by itself. He said that he got into the driver's seat and asked the victim why the victim was trying to rob him and that the victim grabbed him around his neck and grabbed the gun. He said the gun went off again. He said Washington came back and took the victim's gun. He said that he wanted to call the police but that Washington said he was on probation and did not want to wait for the police. He said Washington moved the body to the backseat and later pulled the body out and left it in the grass behind some buildings. He said they dropped off the car and walked to the Elvis Presley Inn. He said Washington cleaned himself because he had blood on him. He said they took the bus to a stop from which they walked back to the Shelby Inn and went their separate ways. He said he thought the victim was already dead when they dumped his body. The statement was signed on March 15, 2005, at 10:30 p.m.

On cross-examination, Lieutenant Wright testified that he was not informed that the defendant tried to turn himself in to police, although he agreed that the defendant was arrested without incident on March 15, 2005. He said that before giving the final statement, the defendant made comments about his religious beliefs and that he "wanted to get all this behind him and turn his life around." He said the defendant never asked for an attorney but that an attorney called and left Wright a message the day after the statement was given. He acknowledged that he never returned the attorney's call.

Dr. O'Brian Smith testified as an expert in the field of forensic pathology. He presented the autopsy report of the victim from December 7, 2002. He determined that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide. He testified that there were three gunshot wound tracts in the victim's body. He explained that a tract was the path of a

-6-

bullet through the body. He was of the opinion that the three gunshot tracts in the victim's body may have been caused by two bullets. The victim had a gunshot entrance wound in his right chest, which traveled in a steep downward angle to the victim's right buttock, where a bullet was recovered. This bullet caused damage to the victim's liver. Because of the presence of gunpowder burns and marks, Dr. Smith believed this wound was a contact wound, meaning that the muzzle of the gun was on or very near the victim's skin at the time it was fired. Dr. Smith identified a second gunshot tract, which consisted of a bullet entering the victim's left back, traveling through the victim's left lung and heart, and leaving through the center of the victim's chest. He said that some powder burn was present around the entrance wound of this tract but that it did not appear to be a contact wound. His opinion was that the gun may have been within six inches of the victim's skin. Dr. Smith also identified a gunshot wound to the victim's right hand. He described this wound as being atypical and believed the bullet may have passed through another object before reaching the victim's hand. A bullet was recovered from directly under the skin of the hand. He thought this bullet may have been the same bullet that entered the victim's back and exited from his chest, and he said it was possible the victim's hand was against the chest when the bullet exited.

Dr. Smith identified photographs of the victim's wounds, some of which showed burn marks which Dr. Smith said were characteristic of a contact wound. He also identified the victim's clothing and the damage to the clothes from the gunshot wounds. He said the angle of the tract from the bullet that entered the victim's right chest and left from the buttock area was consistent with the victim being shot by someone reaching from behind him. Dr. Smith performed a toxicology analysis on the victim and said it came back negative for both alcohol and drugs. He explained that the toxicology test would not indicate whether a counterfeit drug substance was in the victim's body. Dr. Smith identified an abrasion on the victim's right eyelid and an old abrasion and pressure marks on the victim's left ear and jawline.

On cross-examination, Dr. Smith testified that the evidence could be consistent with a struggle occurring between the victim and the shooter. He said the gunshot wound to the victim's chest could possibly have occurred from the victim leaning forward when he was shot. He said if the gunshot wound to the chest were the first wound, the victim would have been able to live for a short while afterwards. However, he said he had no way of knowing if this wound did occur first.

Teri Arney, a special agent forensic scientist with the Tennessee Bureau of Investigation testified as an expert in firearms identifications. She examined two bullets recovered from the medical examiner's office related to the death of Adrian Pegues. She said the two bullets were fired from the same weapon, which was a .40 caliber firearm. She also examined a fired gun cartridge case, which she said also came from a .40 caliber firearm. On cross-examination, Agent Arney testified that a .40 caliber gun is considered a mid-sized weapon, as is a 9 millimeter gun.

The defendant testified that he had completed two years at a community college and had a long work history. He said that in December 2002, he was staying with Tureasa Jones. He said he ended his relationship with Jones because he did not want to continue selling drugs, as she wanted him to. He said he later got into an altercation with a man who had moved into Jones' house and

was selling drugs from there, which led to the defendant's taking drugs from the man. He said he started receiving threats that people wanted to kill him, which caused him to move into a room at the Shelby Inn.

The defendant testified that on December 6, he went to the Horseshoe Casino and won over $1000 by gambling. He said he returned to the Shelby Inn and looked for Rondall Washington, who was a friend of his. He went to Washington's room and saw the victim and some other people there gambling. He said he told the people that he had won some money in the casino, and they convinced him to play with them. He said he stopped playing after he won $100 from the group. He said he then offered the victim $10 to take him to Jones' home in the McCorkle apartments. He said that the victim first refused to take him, that he called a cab, and that thirty to forty-five minutes later, the cab had not come and the victim agreed to take him.

He said he, the victim, and Washington rode together and first stopped at a Citgo, where the victim made a telephone call and where Washington bought cigarettes and beer. He said the victim then drove them to a house, where the victim went inside while he and Washington waited in the car. The defendant said that he heard arguing and that when the victim came back outside, he encouraged the victim to leave. He said the victim got angry with him and yelled, "I ought to rob you." The defendant said that after that, he wanted to walk the rest of the way but that Washington convinced him to stay with him and the victim. He said that they returned to the car and that the victim drove them toward McCorkle apartments. However, the victim told the defendant that he could not go into the entrance of the apartments because he owed people there some money. The defendant said he told the victim that he did not want to be dropped off elsewhere and that he offered the victim $5 more to drive him to the defendant's brother's house, which was nearby.

The defendant said the victim drove to a park and told Washington to get out of the car so he could talk to the defendant alone. He said that when Washington walked away from the car, the victim turned to him and said, "you know what time this is," and pulled a gun on him in an attempt to rob him. The defendant said that he had flashbacks to when he was shot in the past and grabbed the victim's gun. He said they "wrestled and tussled" over the gun and that the gun eventually fell. He said that the victim bent over to pick up the gun and that he then took out his own gun from his waistband and, as the victim was coming back up with the gun that had fallen, he shot the victim. He said that while his finger was still on the trigger, the gun went off again and shot the victim in his right shoulder. He said that the car was rolling by this time, that he jumped out of it, and that he reached in and shifted the car to park. He said that he dropped his gun, that it fell to the floor and fired, and that it got jammed. He said the victim reached out and grabbed the back of his neck and then grabbed the defendant's gun, causing a bullet to fall to the floorboard of the car.

The defendant testified that he explained what happened to Washington and told Washington that they needed to contact the police. He said Washington did not want to call the police because he was on probation from a sentence in Arkansas. He said they also did not have a telephone, so they decided to take the victim, who was still alive, to a hospital. He said that Washington drove at first but that the defendant took over when Washington's driving became erratic. He said that when

they drove up to a hospital, he checked the victim's breathing and pulse and determined that the victim was dead. He said he continued driving and that he found himself driving near some warehouses. He said Washington asked him to pull over behind the warehouses so Washington could urinate. He said the next thing he knew, Washington was outside and dragging the victim's body out of the car. The defendant drove away after Washington returned to the car, leaving the victim's body outside. He said he parked the car somewhere and walked and checked into the Elvis Presley Inn. He and Washington cleaned themselves in a room at the Inn and then caught a bus that took him near his brother's house. He said that he and Washington walked to his brother's house and that his stepfather drove them to the Shelby Inn in a red truck. He said Washington returned to his room with him but later left, saying he would return soon. He said Washington did not run out of the room or hide.

The defendant testified that he did not know Jason Washington, also known as Little Jay, and did not have a back room conversation with him the night of the victim's death. He said he never made any comment about his wondering how much money the victim had. He said he never intended to rob the victim. He denied hiding from authorities after the shooting. He said he went to the Horseshoe Casino a few days after the shooting and stayed for three days in a free room. He said he did not go to the police because he was scared and did not know what to do. He said he went to Gulfport, Mississippi, and worked two jobs in order to save money to hire a lawyer and make bail because he planned to turn himself in to the police. He said he returned to Memphis and lived there for a year and a half before he was arrested. He said that on March 15, 2005, the day he was arrested, his mother had called his attorney and asked him to represent the defendant, because the defendant was going to turn himself in to the police. However, before he had the opportunity to do that, the police found him and arrested him.

The defendant testified that he was on probation at the time of the shooting and had violated his probation. He acknowledged previous convictions related to marijuana possession, felony drug charges, failure to appear, and forgery. He also said he did not do the right thing when he did not contact the police immediately after the shooting. He said he should have flagged down police that he saw while he and Washington were driving around with the victim's body. He apologized for what he did and the mistakes that he made, but he maintained that he shot the victim in self-defense.

On cross-examination, the defendant acknowledged that, on the night of the victim's death, he had drugs, money, and a gun in his possession. He also acknowledged that several things he said in his testimony do not appear in his written statement to police, including that the victim demanded money from him, that he and the victim wrestled over the victim's gun, and that the car was moving after he shot the victim. He said he mentioned these things to Lieutenant Wright, but that Wright told him it was not important to amend the statement to include these details. He said he heard the victim mumbling in the back seat of the car while he was driving to the hospital but that when he arrived at the hospital, the victim was not breathing. He said Washington took the victim's gun and gave it to the defendant while they were at the Elvis Presley Inn. He said he gave the gun to a friend to dispose of it. He said he also gave his own gun to someone. He said that his clothes got bloody from moving the defendant's body to the back seat of the car and that he threw the clothes away.

He acknowledged that two and one-half years passed after the shooting and before he was arrested and questioned in relation to this case, but he maintained that he intended to turn himself in.

After hearing the foregoing evidence, the jury returned a verdict, acquitting the defendant of count two, felony murder, and count three, especially aggravated robbery. He was found guilty of voluntary manslaughter. The defendant now appeals this conviction and his ten-year sentence.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is not sufficient to support his conviction for voluntary manslaughter. Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was charged with first degree murder, which is defined, in part, as the "premeditated and intentional killing of another." T.C.A. § 39-13-202. He was convicted of voluntary manslaughter, which requires "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211. The state presented evidence at trial that the defendant shot the victim without provocation and thereafter hid the victim's body and evaded prosecution. The defendant presented contrary evidence that the victim pointed a gun at him and tried to rob him and that he shot the victim in self-defense. Our code states that a person who has reasonable fear of imminent danger, death, or serious bodily injury is justified in using force in self-defense to the degree necessary to protect against the other person's use of unlawful force. T.C.A. § 39-11-611.

In convicting the defendant of the lesser included offense of voluntary manslaughter, the jury apparently adopted a version of events that combined the state's and defendant's proof–that the defendant shot the victim under provocation but that the defendant was not justified in using deadly force. We conclude that sufficient evidence exists for this conviction. It is true that the state has the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). However, the issue of whether the defendant was justified in using self-defense is a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 742 (Tenn. Crim. App. 1994). In this case, the jury heard testimony from the defendant that he acted out of fear for his life and apparently rejected this defense. It is not the province of this court to second-guess factual determinations made by the jury. We conclude that the evidence was sufficient to convict the defendant of voluntary manslaughter.

## II. MOTION TO SUPPRESS

The defendant contends that his statement to police was not given knowingly and voluntarily and that the trial court erred in denying his motion to suppress the statement. The defendant specifically argues that his request for an attorney was ignored by police officers and that officers coerced and pressured him into waiving his rights and giving the statement. The state contends that because the trial court accredited testimony that the defendant gave his statement willingly and voluntarily, the trial court properly denied the motion.

At the motion to suppress hearing, Lieutenant Wright testified that the defendant was arrested on March 15, 2005, at the home of his girlfriend, Lavonda Campbell,[1] for probation violation and that the defendant was also wanted for questioning in relation to Adrian Pegues' homicide. He said he questioned the defendant in the Memphis Police Department's Project Safe Neighborhoods office. He said the defendant had been given some food and drink when he first arrived at the office. He said he met the defendant in an interview room at the office at 7:15 p.m. He said the defendant appeared to be tired and nervous and was advised of his rights by Detective J. P. Smith in Wright's presence. He said that they had the defendant read the advice of rights form aloud to verify the defendant's education level and that the defendant signed the form. On the form, the defendant answered "yes" to the question of whether he wished to talk to the officers, with his rights in mind. He said the defendant never asked for an attorney or stated that he wanted to see an attorney. He said the defendant never stated that he did not want to talk to the officers. He said the defendant "was willing to talk. He was ready to talk. He was . . . like he was wanting to get something off his chest." Wright said the defendant talked about his religion and how he had changed his life. He said the defendant first volunteered information about a different homicide investigation and talked about that for about one and a half hours. He said that the defendant took a break to use the bathroom and that, after the break, he and Detective Smith asked the defendant about Adrian Pegues. He said the interview regarding the present case began at about 8:45 p.m. The written statement included that the defendant was advised of and understood his rights. He said the defendant was sad while giving the statement and was crying. He said that neither he nor Smith ever threatened the defendant and that the defendant seemed very coherent and intelligent. He said the defendant placed a telephone call at 11:47 p.m. to Ms. Campbell. Although given the opportunity, the defendant did not want to make a telephone call before he gave the statement.

On cross-examination, Lieutenant Wright testified that officers were at Ms. Campbell's house at least thirty to forty-five minutes before Wright arrived. He said that the scene was calm when he arrived and that the defendant was in a police vehicle. He acknowledged that he did not know what was said to the defendant by other officers before he arrived at the scene and that he did not ride in the same car as the defendant to the office. He said that the defendant was arrested at 2:50 p.m. and that he had no dealings with the defendant between that time and 7:15. He said another officer took the defendant to the bathroom before the defendant gave the statement about Pegues. He said the

---

[1] At the time that of the arrest, Ms. Campbell's name was Lavonda Smith, but by the time of the hearing, her name was Lavonda Campbell.

defendant did not appear to be on drugs. He said the defendant never mentioned to him that the defendant had been threatened by anyone or had told someone he wanted to speak to an attorney. He said it was possible that the defendant made a call to Campbell before 11:47 but that he did not have notice of such. He said the defendant talked about the Bible and church and wanting to be a minister. He testified that the defendant was told that "[i]f he wanted to clear his name, clear himself and clear his heart, now would be the time to come and talk about it to us and to God." He denied that he was pressuring the defendant to confess and said that the defendant wanted some comfort and help to get the confession out. He said the defendant never asked to speak to his girlfriend or pastor at any time during the interrogation. He said that the day after the interrogation, he received a voice message from an attorney inquiring whether the defendant was in custody. He said he never called the attorney back. He said the defendant was never promised anything in return for a confession. He said there were never more than two investigators in the room with the defendant during the interrogation. He said the defendant never complained about his treatment by police.

The defendant testified that he had contacted an attorney about turning himself in to the police. He said he was ready to turn himself in when officers came to Campbell's house and arrested him. He said that when he was arrested, he told officers that he had a lawyer and that he did not want to say anything until he talked to his lawyer. He said that at the Projects Safe Neighborhoods office he was told his attorney was on the way, that his attorney came to the office looking for him, and that the attorney left after not finding him. He said that he was at the office for about an hour before seeing Lieutenant Wright and that during that hour he denied any involvement in a different murder the police were investigating and said he did not want to talk to them about anything else. He said a Lieutenant Clark talked to him about his Bible and his religion and told him that he should confess to police and to the Lord. He said Clark told him he could get a sentence of twenty years at twenty percent if he confessed. He said he was on the telephone with Campbell when another officer told him he could be facing the death penalty. He said that he later asked where his lawyer was and that an officer got upset and slammed a chair, complaining that he was not "going to go over that lawyer routine with [the defendant] again." He said that officers repeatedly asked him about the victim, despite his requests for a lawyer and told him he would receive a light sentence if he confessed. He said he eventually "broke down" and did make a truthful statement.

The defendant acknowledged that he wanted to get the information about the victim's death "off [his] chest" but said he "also was coerced into making those statements." He said officers read him his rights at the Project Safe Neighborhoods office but not until three or four hours after he was taken there. He acknowledged that officers went over the advice of rights form with him and that he read it, but he said he had told them previously that he did not want to talk to them and that he wanted to talk to his lawyer. He said that when the officers asked him about Pegues, he put his head down and moaned and told them he did not want to talk about it. He said they kept questioning him and showed him pictures of Rondall Washington. He acknowledged that he answered "yes" and initialed the part of the written statement asking whether he was advised of his rights and whether he wanted to speak to the officers. He said that he reviewed the statement after it was typed and that it was the statement he wanted to give. He said on cross-examination that his telephone conversation with Campbell, during which an officer threatened him with the death penalty, occurred after he was

-12-

advised of his rights and gave his statement. He maintained that he repeatedly told officers that he did not want to speak to them and that he wanted to speak to his attorney.

Lavonda Campbell testified that the defendant was her fiancé when he was arrested on March 15, 2005, and was her son's father. She said the police came to her door just as she and the defendant were preparing to drive downtown to turn the defendant in to the police. She said the defendant was handcuffed and taken to a patrol car without his rights being read to him. She said she received a telephone call from the defendant sometime between 7:30 and 8:00 that evening. She said the defendant asked her why she had not come to see him and told her that officers told him they would allow Campbell and his pastor to visit him if he talked to the officers. She told him no one had contacted her. She said she heard the defendant telling someone that he did not want to talk and that he wanted a lawyer. She said she heard someone in the background tell the defendant that if he talked to the police, they would "try to get him justifiable homicide." She said she then heard someone tell the defendant that he was "going to go up for murder one . . . capital punishment." She said that she talked to the defendant for about ten minutes and that the defendant called her back before 11:00. She said the defendant told her he was waiting for his attorney and that he had given a statement. She said the defendant made a total of three calls to her that night: two from a cellular telephone and one from a jail phone after 11:00 p.m.

After hearing the foregoing evidence, the trial court ruled that the statement was given voluntarily and was not taken in violation of the defendant's <u>Miranda</u> rights. The court found:

> [W]eighing all of the facts and circumstances, I feel that this defendant had the wherewithal to remain silent if he wanted to. I don't think that he was a person that could be bullied into making a statement easily, if he didn't want to.
>
> He didn't say anybody threatened him, or anything like that, or did anything to him. . . .
>
> Now, the Court is of the opinion that this defendant knew his rights. And I don't think that he stated here that he didn't know his rights. What he said here is that they kept asking him and he never did see a lawyer. And the Court's not sure whether or not he asked for a lawyer, or not.
>
> The documents that we have, several of them, on these statements, didn't indicate that he wanted a lawyer. And he surely didn't have to sign them. And he's not someone who is of little education. He's got a college education.
>
> So the Court is of the opinion that these were freely and voluntarily given by the defendant.

-13-

In evaluating the trial court's ruling, we note that a trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which we review de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Id. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). A statement given in violation of a defendant's constitutional rights may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994).

Our review of the record supports the trial court's findings that the defendant voluntarily waived his Miranda rights and gave a voluntary statement. There was evidence indicating that the defendant was informed of his rights and waived them, and that waiver was memorialized in writing. The trial court did not credit the defendant's testimony that he was pressured and coerced into making the statement. The trial court further took into consideration the defendant's mental state, education, and intelligence in finding that the defendant's statement was voluntary. The trial court did not err in refusing to suppress the defendant's statement.

### III. ADMISSIBILITY OF PHOTOGRAPH OF THE VICTIM

The defendant contends that the trial court erred by allowing the state to introduce into evidence a photograph that depicts the dead victim lying in the grass behind a warehouse. He argues that the photograph should have been excluded because its probative value was outweighed by its prejudicial effect. The state counters that the photograph was properly admitted because it was relevant evidence and was not prejudicial.

The admissibility of photographs is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988). A photograph is admissible if it is probative to some issue in the case and if its prejudicial effect does not outweigh its probative value. State v.

Banks, 564 S.W.2d 947, 951 (Tenn. 1978); see Tenn. R. Evid. 403 (allowing the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). Even photographs of a gruesome and horrifying nature may be admitted into evidence if they are relevant and not unfairly prejudicial. Banks, 564 S.W.2d at 950-51. Evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401.

The photograph depicts the victim's corpse on the ground. It is not a close-up picture; rather, it shows the victim's entire body, on its back, with the victim's torso slightly bent and his arms raised above his head. The victim is clothed in the photograph, although his shirt and jacket are raised, exposing his torso. The photograph was introduced during Rondall Washington's testimony, and Washington testified that the photograph depicted the victim in the state that he and the defendant left the victim. In overruling a defense objection regarding the relevance of the photograph, the trial court found that the photograph was relevant to the state's case and was not gruesome in nature. We agree.

The photograph corroborates Washington's testimony about the events surrounding the victim's death, particularly the way in which the defendant disposed of the victim's body after death. The defendant argues that the photograph should be not admissible for this purpose because the parties agreed that the body of the victim was left in the location depicted in the photograph. However, as the state points out, our courts have previously held that "the prosecution's right to prove its case . . . may not be foreclosed by a defendant's characterization of the proof as undisputed or by a defendant's offer to stipulate or concede certain factual issues." State v. Robinson, 146 S.W.3d 469, 491 (Tenn. 2004). We agree with the trial court that the photograph is not gruesome or otherwise unfairly prejudicial. We also note that the defense actually made use of the photograph in question by noting an inconsistency in Washington's previous statement to police, in which Washington said the victim was dragged on his belly and left face-down in the grass. We conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in admitting the photograph.

## IV. SENTENCING

The defendant contends that his sentence is excessive because the trial court misapplied enhancement factors and failed to apply appropriate mitigating factors. After hearing arguments by counsel, the trial court determined that the defendant was a Range II offender and that the following enhancement factors should apply, pursuant to Tennessee Code Annotated section 40-35-114 (2003):[2] (1) that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (3) that the defendant was the leader

---

[2] We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal.

in the commission of an offense involving two or more criminal actors; (9) that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; (10) that the defendant possessed or employed a firearm; and (14) that the offense was committed while the defendant was on probation. The court did not apply any mitigating factors and ordered that the defendant's sentence would be ten years.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003). As the Sentencing Commission Comments to this section note, the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if we would prefer a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this regard, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentencing range for a Range II, multiple offender convicted of a Class C felony is six to ten years. See T.C.A. § 40-35-112(a)(3). Under the law applicable at the relevant time, six years was the presumptive sentence the trial court should have imposed unless enhancement factors were found. T.C.A. § 40-35-210(c) (2003). The trial court increased the defendant's sentence to the maximum in the range after applying five enhancement factors and no mitigating factors.

The defendant argues on appeal that the trial court erred in applying enhancement factors (3) that he was the leader in the commission of an offense and (10) that he possessed or employed a firearm during the commission of the offense. We question whether the evidence showed that the defendant was the leader in the commission of an offense involving multiple criminal actors. At the most, the evidence established Washington's presence at the scene of the crime and that Washington was involved in the disposal of the victim's already dead body, but this alone does not warrant a finding that Washington was involved in the victim's murder and that the defendant led him in the offense. See, e.g., State v. Mark Walker, No. M2001-00341-CCA-R3-CD, Davidson County, slip op. at 14 (Tenn. Crim. App. July 16, 2002) (holding that although security guard saw defendant and another man in same vicinity and suspected them to be working together to commit theft, there was not sufficient evidence that defendant was leader in the commission of the offense or that they were acting in concert to commit the offense). Therefore, the trial court misapplied this factor. However, we reject the defendant's argument that factor (10) did not apply because his possession of a firearm was an essential element of and inherent in the convicting offense. The defendant was convicted of voluntary manslaughter, which, as noted previously is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211. The use of a firearm is not an essential element of the offense.

The defendant also argues that the trial court should have applied mitigating factors that he acted under strong provocation and that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." T.C.A. § 40-35-113(2), (3) (2003). Regarding the provocation factor, we note that this factor does not automatically apply in voluntary manslaughter cases. See, e.g., State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006, Robertson County, slip op. at 8 (Tenn. Crim. App. July 14, 1995). Furthermore, the trial court found that, in its opinion, the evidence was sufficient to sustain a conviction of a higher degree than voluntary manslaughter and that the homicide was not justified. We see nothing in the record to suggest that the trial court erred in failing to apply these mitigating factors.

Although we conclude that the trial court erroneously applied enhancement factor (3), this error does not require a sentence modification. See State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) ("The mere number of existing enhancement factors is not relevant—the important consideration being the weight to be given each factor in light of its relevance to the defendant's personal circumstances and background and the circumstances surrounding his criminal conduct."). Furthermore, upon our de novo review, we conclude that the ten-year sentence was proper. The defendant's criminal history, as reflected in his presentence report, consists of at least ten convictions, including three felonies and several misdemeanor convictions. The defendant does not dispute the application of this enhancement factor or the factors related to his being on probation at the time the offense was committed and his history of unwillingness to comply with previous sentences of release. The defendant also acknowledged that he used a gun to commit the offense. Neither the presentence report nor the evidence at trial reflect that any mitigating factors should have been applied. The ten-year sentence is supported by the record.

-17-

**CONCLUSION**

Based on the foregoing and the record as a whole, we determine that there is no error in the judgment of the trial court. The judgment is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE